[Cite as *In re J.T.*, 2011-Ohio-3435.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

IN THE MATTER OF:

**J. T.**

CASE NO.  16-10-12

ALLEGED NEGLECTED,
DEPENDENT CHILD,

**O P I N I O N**

[CARRIE THIEL - APPELLANT].

**Appeal from Wyandot County Common Pleas Court
Juvenile Division
Trial Court No. C2092010**

**Judgment Affirmed**

**Date of Decision:   July 11, 2011**

**APPEARANCES:**

   *Scott B. Johnson* **for Appellant**

   *Douglas P. Rowland*  **for Appellee**

**ROGERS, P.J.**

{¶1} Defendant-Appellant, Carrie Thiel ("Carrie"), appeals the November 2010 judgment of the Court of Common Pleas of Wyandot County granting legal custody of her minor son, J.T., to J.T.'s paternal grandparents, Larry and Debrah Thiel ("the grandparents" or "the Thiels"), granting protective supervision over J.T. to the Wyandot County Department of Job and Family Services ("WCDJFS"), and finding Carrie in contempt of court. Carrie argues that the trial court erred in admitting evidence of certain medical records that contained hearsay statements; that the trial court erred in allowing the psychological evaluation testimony to be based on medical records that were not admitted into evidence; that the trial court abused its discretion as its ruling was against the preponderance of the evidence; and, that Carrie's counsel provided ineffective assistance of counsel. Based upon the following, we affirm the judgment of the trial court.

{¶2} On June 5, 2009, the WCDJFS filed a two count complaint and a motion for emergency custody in the Court of Common Pleas, Juvenile Division, of Wyandot County alleging that J.T. was a neglected child as defined in R.C. 2151.03(A)(2), (3), and that J.T. was a dependent child as defined in R.C. 2151.04(B), (C). WCDJFS requested in the complaint that emergency custody of J.T. be granted to the grandparents and that protective supervision of J.T. be granted to WCDJFS.

{¶3} In the statement of facts submitted with its motion, WCDJFS indicated that the agency recently received five reports alleging neglect of Carrie's children resulting from inadequate supervision, drug use, and domestic violence with the children present. According to WCDJFS, WCDJFS attempted to contact Carrie at her home on June 2, 2009, but was unsuccessful. On June 3, 2009 Carrie called WCDJFS, and then arrived at its office. WCDJFS reported that during the visit Carrie was observed to act "erratically and appeared to be under the influence of an unknown substance." (Statement of Facts, Docket No. 1). Due to these concerns, WCDJFS and the Wyandot County Prosecutor's Office determined that Carrie was not an adequate caretaker for her children. Since the children were not in Carrie's custody at the time, WCDJFS determined that no further action was needed. However, on the evening of June 3, 2009, Carrie did attempt to retake custody of two of her children from their father's house, which required WCDJFS's involvement. Carrie and WCDJFS ultimately agreed to allow Carrie to take the two children for one night to Carrie's friend's house upon Carrie's promise to get a drug test the next morning and to meet with the case worker the next day. Carrie failed to fulfill either of her promises.

{¶4} On June 5, 2006, the trial court granted WCDJFS's motion for emergency custody, awarding emergency custody of J.T. to the grandparents.

{¶5} On July 1, 2009, the trial court held an adjudicatory hearing after which it found that J.T. was a dependent, but not a neglected, child. On July 23, 2009, the trial court held a dispositional hearing. The trial court ordered that WCDJFS's case plan be implemented, which required Carrie to undergo random drug testing, and granted temporary custody of J.T. to the grandparents and protective supervision of J.T. to WCDJFS.

{¶6} On August 5, 2009, WCDJFS moved the trial court to direct Carrie to immediately comply with random drug testing upon request. In its memorandum WCDJFS expressed that, on August 3, 2009 at approximately 10:25 A.M., it had requested Carrie to submit to a random drug test at Wyandot Memorial Hospital pursuant to the court-ordered case plan. Carrie reported for the drug screen at 4:15 P.M., approximately six hours after WCDJFS requested her to arrive. WCDJFS relayed its concern that "such delay could jeopardize the validity of the results of the drug screen due to potential masking, flushing and/or other deception." Motion, Docket No. 52. The trial court ordered that Carrie must comply with WCDJFS's requests for random drug screens within twenty minutes of the request, absent valid excuse or emergency.

{¶7} On October 30, 2009, the trial court granted WCDJFS's motion to order Carrie to complete a psychological evaluation. In its motion, WCDJFS reported that, although Carrie's drug screens were negative, Carrie continued to

exhibit erratic behavior, was visibly shaking, unable to stand still, and had red marks on her neck, and that WCDJFS continued to receive reports from community members regarding Carrie's behavior. WCDJFS reported that Carrie had engaged in services at Firelands for a substance abuse assessment. Ultimately, Firelands closed Carrie's case as it was unable to address Carrie's drug use due to her denial of the same. Further, WCDJFS stated that, after researching Carrie's medical history and multiple visits to emergency rooms, there appeared to be a pattern of Carrie going to the emergency rooms, complaining of pain, requesting specific narcotics, and being discharged with a prescription for narcotics. According to WCDJFS, doctors had confronted Carrie regarding her drug seeking behavior.

{¶8} On November 24, 2009, WCDJFS filed a motion to show cause why Carrie should not be found in contempt of court for failing to follow through with the trial court's October 30, 2009 order to complete a psychological evaluation. According to its motion, WCDJFS had arranged for Dr. David K. Connell ("Dr. Connell"), a clinical and forensic psychologist, to perform Carrie's psychological evaluation. On November 23, 2009, Carrie met with Dr. Connell and signed the necessary contract and drug testing consent forms. Dr. Connell then requested Carrie to provide a hair sample for purposes of drug testing. Carrie refused to submit to the drug test and refused to cooperate further with Dr. Connell.

{¶9} On February 5, 2010, WCDJFS filed a motion to place J.T. in the legal custody of the grandparents. In the attached statement of facts, WCDJFS stated the following reasons in support of the motion: that Alec Thiel, J.T.'s father, was currently serving a 17-month prison sentence for drug-related charges; that an agency worker observed a water shut off notice at Carrie's residence as well as a summons for a court hearing; that Carrie had not notified the agency worker of her release from the hospital and her new address; that Carrie was continuing to exhibit erratic behaviors, was involved in criminal activity, had continued to visit distant emergency rooms; and, that Carrie had decreased her time with J.T., at times allowing more than a week to pass between her contacts with him.

{¶10} On March 2, 2010, the grandparents filed a motion for joinder and a motion for custody, moving the trial court for an order granting them custody of J.T. The trial court granted the motion for joinder.

{¶11} The hearing on the motion for legal custody and the motion to show cause took place on May 25, 2010.

{¶12} At the hearing, the assistant Wyandot County prosecutor presented the following exhibits: Carrie's medical records from Wyandot Memorial Hospital as State's Exhibit 6, Hardin Memorial Hospital as State's Exhibit 8-A, Marion Pain Clinic as State's Exhibit 9, Marion General Hospital as State's Exhibit 10, and Blanchard Valley Hospital as State's Exhibit 11. The trial court admitted all

with the exception of Exhibit 10 as the certification was not properly verified as required by R.C. 2317.42.2(A).

{¶13} The State presented Dr. Connell who testified that he met with Carrie for her psychological evaluation on November 23, 2009. He stated that he explained the procedure to Carrie, discussed her rights, and that Carrie signed the release and confidentiality forms. He explained that when he went to collect the sample of hair, Carrie became "increasingly irritable and belligerent. Then she said, 'Get April in here. I'm not gonna do this. This is crap.' " Hearing Tr., pp. 38-39. Dr. Connell testified that Carrie was cooperative for about fifteen minutes and then was resistant, defensive, and argumentative for about 45 minutes.

{¶14} He also stated that he had reviewed Carrie's medical records, including Exhibit 8-A from Hardin Memorial Hospital, Exhibit 11 from Blanchard Valley Hospital, and Exhibit 6 from Wyandot Memorial Hospital. Dr. Connell testified that, based on his experience, training, familiarization with Carrie's case, and her medical records, Carrie was addicted to drugs and, from 2004 to 2009, has frequently gone to different hospitals and emergency rooms, complaining of pain and seeking narcotics. Dr. Connell also stated that one of the notations included in several of her medical records states, "pain is triggered by nothing. It is helped by nothing." Hearing Tr., p. 47.

{¶15} On cross-examination, Dr. Connell testified that he reviewed Wyandot County Memorial Hospital records dating from March 2005 to May 2009 comprising a total of 38 visits to the emergency room. Dr. Connell testified that Carrie went to "[Blanchard Valley] eleven times in 2005 with abdominal pain, fourteen times to Wyandot Memorial . . . six times to Marion General, . . . and eight times to Hardin." Hearing Tr., p. 89. Dr. Connell also stated, "[t]he question for me . . . is why is she going to all these different hospitals. In some months she goes to three or four different hospitals seeking medication." Hearing Tr., p. 79. Dr. Connell stated that a review of the records indicated that she had never seen a nephrologist nor had surgery for any of her kidney problems. He also testified that there was not much evidence to show that any of her presenting complaints were valid.

{¶16} Carrie then testified. She stated that all of her visits to the emergency room were based on legitimate reasons, and that she received pain medication at the hospital on many occasions. Carrie also testified that she served a jail sentence in April 2010 for complicity to theft. She testified to serving a second jail sentence for "driving off with gas." Hearing Tr., p. 112. She acknowledged that since May of 2009, she had come into contact with law enforcement on fourteen separate occasions. Carrie testified that she has been unemployed since July 2009, that she has been living with her mom since March

or April 2009, and that she had been evicted from her previous home because she was not paying rent.

**{¶17}** April Allison ("Ms. Allison"), a caseworker for WCDJFS, then testified that the ultimate goal for Carrie's case plan was to "get Carrie stable enough to have [J.T.] return to her care." Ms. Allison testified that, in order to assist Carrie in achieving the reunification goal, WCDJFS conducted home visits and referred her to Firelands. On one particular home visit in the fall of 2009, Ms. Allison testified that she had a difficult time engaging Carrie in conversation as Carrie had trouble keeping eye contact and could not stay on topic, that Carrie was pacing across the porch, and that Carrie was unable to stand still. She testified that her concerns about Carrie were due to Carrie's failure to complete the psychological evaluation, her pattern of hospitalization, criminal activity, lack of permanent housing, electricity shut-off notices, abuse of medications, and "doctor shopping." Hearing Tr., pp. 163-165.

**{¶18}** Ms. Allison also testified that J.T. is living with the grandparents, that he feels comfortable in their home, that he is bonded to them, that he is being appropriately cared for, and that she believes it is in J.T.'s best interest to be placed in the legal custody of the grandparents. Ms. Allison testified that recently Carrie has been cooperative and has made some progress with respect to her substance abuse and mental health, but at this point, she does not feel that Carrie is

an appropriate placement for J.T., and that Carrie ought not to have unsupervised or overnight visits with J.T. for the present time.

**{¶19}** On cross-examination, Debrah Thiel ("Deb") testified regarding Carrie's alarming behavior. She said that Carrie is late to about one in every three visits with J.T. One example of Carrie's tardiness was on Christmas Day in 2009; Deb testified that Carrie requested to come over first thing in the morning to see J.T. open his presents, but actually did not arrive until almost two o'clock in the afternoon. On October 25, 2009, Carrie visited J.T. at the Thiel's house and she brought with her a flat screen television to surprise J.T. Deb testified that Carrie said to J.T., " 'there's your TV that got stolen out of my house . . . I was at Eric Shackelford's house and I will swear that that's the TV that gotten (sic) stolen from my house so I took it.'" Hearing Tr., pp. 207-08. According to Deb, about thirty minutes after Carrie said goodbye that evening, Carrie's car was still sitting in the driveway with the dome light on, the door open, and Carrie was "kind of laid out in the front seat." Hearing Tr., p. 209. She then testified that in the past year, she observed Carrie under the influence of drugs on about three or four different occasions. Lastly, Deb testified that she believes it is in J.T.'s best interest to live with her and her husband.

**{¶20}** Louanne Hufford ("Ms. Hufford"), a guardian ad litem ("GAL") with CASA, testified that at this point in time it is in J.T.'s best interest to remain with

the Thiels as J.T. needs consistency. She testified that Carrie is currently unable to maintain a home as she does not have a home of her own or a job.

{¶21} Ms. Hufford also testified that Carrie had exhibited very odd behavior when she and Ms. Allison went to visit Carrie. She testified that she observed Carrie, "crawling out of her skin, clawing at herself, trying to hold herself still . . . She was just clawing and . . . couldn't keep her feet straight. She was putting one foot on top of the other trying to hold it down. [It] was very erratic behavior at that time." Hearing Tr., p. 231. Ms. Hufford testified that she observed Carrie act this way only once, that Carrie admitted to taking Ritalin at that time which was causing her to act erratically, and that apparently Carrie has changed medications. She also testified that Carrie has made recent improvements, keeps in regular contact with J.T., and is attempting to secure her own housing. Ms. Hufford's report was admitted into evidence as Exhibit 1.

{¶22} On direct-examination, Carrie testified regarding her medical ailments. In 2002, Carrie began to experience stomach and bowel problems, including very bad stomach pains. Carrie testified that she went to Wyandot Memorial Hospital and OSU where she underwent testing and was diagnosed with diverticulosis and ulcerative colitis. She began taking various medications, including pain medications. Carrie also testified that, since 2003, she suffered with kidney stones for about three or four years. Carrie testified that she saw a

nephrologist in Lima. Carrie testified that she had a seizure, and that this seizure was caused by Ultram, a certain drug she was taking at the time. She also testified that her kidneys stopped functioning correctly during one of her pregnancies and that she was given narcotics. Carrie further testified that in the last three years she has had two pregnancies that "were very bad" as she was "in and out of the hospital a lot for issues . . . due to the ulcerative colitis." Hearing Tr., p. 279. She testified that she has very high blood pressure which causes her to be in the hospital often. Carrie also stated that she regularly went to OSU for her digestive issues but when she would get sick, as in vomiting blood, she would go to Wyandot Hospital. Further, Carrie testified that she had cysts on her wrist in 2004 or 2005, that she had several laparoscopic surgeries in 2005, that she had toxic shock syndrome in October of 2007, that she received stitches on May 3, 2009 from an incident between her and an ex-boyfriend, that she was assaulted on May 31, 2009, that she had a hysterectomy in July of 2009, that she has been diagnosed with endometriosis, cysts on her ovaries, fibromyalgia, lupus, and that she suffers from a blood clotting disorder and hematoma.

{¶23} Carrie testified that, at her psychological evaluation with Dr. Connell, she refused to complete the psychological evaluation or give a hair sample because she was concerned that Dr. Connell "did not work for [her], where normal psychologists . . . work for you" and because he would not do any follow-

up care, if necessary. Hearing Tr., p. 294. When explaining her interactions with the police, Carrie testified, "I've had numerous occasions where I get waved down and told to get out of my car, I'm intoxicated, and I need to walk." Hearing Tr., p. 309.

{¶24} Carrie testified that all of her drug tests at WCDJFS since July 2009 have been negative. Carrie further testified that she contests permanent custody of J.T. being granted to the Thiels because she wants to raise her son.

{¶25} On August 2, 2010, the trial court issued its written decision, awarding legal custody of J.T. to the grandparents and protective custody of J.T. to WCDJFS. The trial court also found Carrie in contempt of court and imposed a suspended jail sentence of ten days, conditioned upon her completing the psychological evaluation.[1] Carrie timely filed a notice of appeal, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE COURT ERRED IN ADMITTING INTO EVIDENCE CERTAIN MEDICAL RECORDS WHICH CONTAINED RECORDS FROM OTHER UNCERTIFIED SOURCES AND ERRED BY PERMITTING THEIR USE IN SUPPORTING PSYCHOLOGICAL CONCLUSIONS.**

---

[1] Carrie timely filed an appeal. This Court dismissed the appeal sua sponte, finding that we did not have jurisdiction as the judgment entry was not a final appealable order. On November 1, 2010, the trial court entered a proper judgment entry. On November 9, 2010, the trial court vacated Carrie's jail sentence for contempt finding that she had properly purged herself of contempt. Carrie then filed her notice of appeal on November 18, 2010.

*Assignment of Error No. II*

**THE COURT BELOW ERRED IN ALLOWING THE PSYCHOLGICAL EVALUATION TESTIMONY TO BE BASED ON MEDICAL RECORDS THAT WERE NOT ADMITTED INTO EVIDENCE.**

*Assignment of Error No. III*

**THE FINDINGS AND CONCLUSIONS OF THE COURT BELOW WERE NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. IV*

**THE COUNSEL FOR THE DEFENDANT PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL.**

*Assignment of Error No. I*

{¶26} In her first assignment of error, Carrie asserts the trial court should have excluded Exhibits 9 and 11 as they contain "double hearsay." Specifically, Carrie alleges that although these exhibits are business records and were properly admitted, they contain hearsay statements that did not contain verified certifications by an appropriate person according to R.C. 2317.422, and therefore, should have been excluded. Further, Carrie argues that these records should not have been used by Dr. Connell when he concluded that Carrie had a severe drug addiction. We disagree.

{¶27} WCDJFS contends that these records were properly admitted pursuant to R.C. 2317.422. Alternatively, WCDJFS argues that even if they were not properly admitted under this rule, hearsay is admissible pursuant to Juv.R. 34(B)(2) and Evid. R. 803(6), as an exception to the hearsay rule. Lastly, WCDJFS argues that the admission of evidence rests within the discretion of the trial court, and that the appellant must show prejudice. Since Carrie has failed to show prejudice, WCDJFS argues, her assignment of error should be overruled. We agree that Juv.R. 34(B)(2) permits hearsay evidence to be admitted in these circumstances.

{¶28} The exhibits at issue in this assignment of error are Exhibits 9 and 11. Exhibit 9 contains medical records from Marion Pain Clinic, Inc. dating from September 2004 to November 2004. It includes records from, inter alia, the Marion Pain Clinic, telephone consultation notes from Dr. Katabay's office, a letter from WCDJFS, drug screen results from Quest Diagnostics, imaging reports from Marion General Hospital, and images and reports from The Ohio State University Medical Center. The records in Exhibit 9 were certified by a custodian of records at the Marion Pain Clinic. The certification was notarized. Exhibit 11 contains medical records from 2004 to 2009, including pharmacy records, emergency department consultation reports, summary reports, and an operative record from the Blanchard Valley Emergency Department, Blanchard Valley

Health System, Blanchard Valley Hospital Laboratory, and Blanchard Valley Pharmacy. A records custodian from Blanchard Valley Hospital certified these records. The certification was notarized.

{¶29} The issue, therefore, is whether the trial court should have excluded Exhibits 9 and 11 as they contained inadmissible hearsay. We find that hearsay evidence was permissible in the hearing below.

{¶30} Juv.R. 34(B)(2) allows the use of hearsay evidence at dispositional hearings and reads in pertinent part that "the court may admit evidence that is material and relevant, including, but not limited to, hearsay, opinion, and documentary evidence."

{¶31} The Rules of Evidence apply in hearings on motions for permanent custody. Juv.R. 34(I).

{¶32} Initially we note that this case does not involve permanent custody of J.T., but is rather a case of legal custody. R.C. 2151.011(B)(30) defines permanent custody as:

> **[A] legal status that vests in a public children services agency or a private child placing agency, all parental rights, duties, and obligations, including the right to consent to adoption, and divests the natural parents or adoptive parents of** *all parental rights, privileges, and obligations, including all residual rights and obligations.*

(Emphasis added.) Conversely, R.C. 2151.011(B)(19) defines legal custody as:

-16-

> **[A] legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care,** *all subject to any residual parental rights, privileges, and responsibilities.*

(Emphasis added.) As we have noted previously, the important distinction between permanent and legal custody is that the latter does not terminate all parental rights, and the parent may, in the future, petition the court for a modification of custody. *In re Bixler,* 3rd Dist. No. 13-05-41, 13-05-42, 2006-Ohio-3533, ¶21 citing *In re C.R.,* 108 Ohio St.3d 369, 2006-Ohio-1191, ¶17.

{¶33} In the case sub judice, neither party sought permanent custody of J.T. After the hearing on May 25 and 26, 2010, legal custody was granted to the grandparents and WCDJFS was granted protective supervision over J.T. Carrie retained residual parental rights including visitation and the opportunity to seek the return of J.T., and the matter was continued for review within six months. As this hearing was not a permanent custody hearing, but rather a dispositional hearing, Juv.R. 34(B)(2) applies rather than the Rules of Evidence. Hearsay is therefore permitted at this hearing. Accordingly, we overrule Carrie's first assignment of error.

*Assignment of Error No. II*

**{¶34}** In her second assignment of error, Carrie argues that the trial court erred by allowing Dr. Connell to base his psychological evaluation testimony on his review of medical records, including those records in Exhibit 10, which was properly excluded by the trial court. Without the records in Exhibit 10, Carrie argues, the weight of the evidence considered by Dr. Connell would have been skewed differently and Dr. Connell may have had a different opinion.[2]

**{¶35}** WCDJFS contends that this assignment of error is not supported by the record; rather, the record reflects that WCDJFS explained to Dr. Connell that portions of the medical records were not allowed into evidence, and that Dr. Connell testified that he reviewed Exhibits 6, 8-A, 9, and 11. Therefore, WCDJFS asserts that Dr. Connell's testimony did not rely upon Exhibit 10.

**{¶36}** The transcript of the May 25, 2010 hearing shows that the assistant prosecutor for Wyandot County handed Dr. Connell Exhibits 8-A, 11, 6, and 9, and instructed Dr. Connell "to speak to only those records that [he had] reviewed that [the prosecutor] handed [Dr. Connell] . . .". Hearing Tr., p. 43. Mr. Workman, attorney for Carrie, on his cross-examination of Dr. Connell instructed him to speak only on Wyandot records. Hearing Tr., p. 63. The court questioned

---

[2] We note that, with respect to her second assignment of error, Carrie fails to cite to any legal authority as required by Ohio R.App.P. 16(a)(7). Despite this Court's ability to disregard this assignment of error according to Ohio R. App. P. 12(a)(2), we will proceed to the merits.

Dr. Connell, "You said you reviewed 38 visits to Wyandot Memorial Hospital . . . from . . . March of '05 to May of '09. Could you tell me how many visits within that same general time frame there was (sic) at Blanchard? . . . Could you tell me how many, excluding Marion General?" Hearing Tr., p. 103. The trial court again questioned Dr. Connell, "how many visits at each hospital institution, excluding Marion General." Dr. Connell responded the following:

> **Wyandot Memorial 3-05 through 5-09, 38 visits, Hardin Memorial 2-05 through 2-06, three visits. Blanchard Valley Hospital 10-04 through 6-09, 32 visits.**

Hearing Tr., p. 104. Dr. Connell did, however, twice mention Carrie's visits to Marion General Hospital in his testimony. First, when prompted by Mr. Workman why Carrie's visit to Wyandot Memorial on April 20, 2005 caused him concern, Dr. Connell responded that she also visited Marion General Hospital on March 14, 2005 for abdominal pain. Hearing Tr., p. 78. Second, when asked by Mr. Workman if Carrie was at Blanchard Valley in 2005 for a kidney stone issue, Dr. Connell responded the following:

> **Primarily for the kidney stone issue she went to BV 11 times, in . . .'05 with abdominal pain. She went to Wyandot Memorial Hospital 14 times. [L]et's see, Marion General, one, two, three, four, five, six times.**

Hearing Tr., pp. 88-89. Therefore, the record reveals that Dr. Connell did testify regarding the Marion General records, even though these records were excluded

and he was instructed not to refer to them. As no objection was made to this testimony at the hearing, we review for plain error.

{¶37} In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.'" *Ordean v. Ordean*, 3d Dist No. 17-06-15, 2007-Ohio-3979, ¶14, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 1997-Ohio-401, syllabus. We find that Dr. Connell's mention of Carrie's visits to Marion General is not the extreme case that seriously affects the basic fairness, integrity, or public reputation of the judicial process.

{¶38} Dr. Connell gave a lengthy testimony through which he explained his credentials, his meeting with Carrie to evaluate her, Carrie's premature termination of the meeting by refusing to give a hair sample, his review of her "voluminous medical records" including those from Hardin Memorial Hospital, Blanchard Valley Hospital, Wyandot Memorial Hospital, and Marion Pain Clinic. When asked what his opinion and findings were, based on his experience, training, and familiarization with the case and medical records, Dr. Connell responded:

> **Well . . . overall looking at the hospital records, I think it's . . . very clear to me that . . . Carrie was . . . probably addicted to narcotics . . . and spends a lot of time and effort going to different hospitals. [T]he records that I saw beginning in . . . '04 . . . seeking . . . sometimes daily . . . doses of narcotic medications, primarily narcotics.**

Hearing Tr., p. 44. When asked by the trial court to give a general idea of the time period in which this behavior occurred, Dr. Connell responded:

> **Well, I think the first records I reviewed were from . . . 2004. The last records I reviewed were from 2009. And there seems to be a pretty consistent pattern during that five year period of very frequent . . . trips to the emergency room at different hospitals complaining of some kind of pain, either abdomen pain, sometimes tooth pain, . . . sometimes hand pain, a wrist pain, and always with the request for narcotics.**

Hearing Tr., p. 45. Further when asked whether Carrie's kidney issues would have supported her request for pain medication, Dr. Connell responded:

> **[O]ne of the things that is noted on several of the medical records . . . is the line . . . "pain is triggered by nothing it is helped by nothing."**

Hearing Tr., p. 47. Lastly, when asked whether being addicted to pain medications would impact parenting, Dr. Connell responded, "Absolutely, yes." Hearing Tr., p. 47.

{¶39} On cross-examination, Mr. Pfeifer, attorney for the grandparents, asked Dr. Connell, "And is it your professional opinion, based upon years of experience and reviewing her hospital records, that she's a drug seeker?" Hearing

-21-

Tr., p. 102. Dr. Connell responded, "Yes. And . . . that's something that came up again and again in the documentation that . . . doctors at the hospital . . . refused to treat her because . . . of that issue." Hearing Tr., p. 102.

{¶40} In light of the foregoing testimony of Dr. Connell, there is no indication that Dr. Connell relied on the Marion General Hospital records in forming his opinion that Carrie is a drug seeker and addicted to narcotics. Although Dr. Connell made two cursory statements regarding Carrie's visits to Marion General, this does not equate to reliance on them in forming his opinion, especially in light of the hundreds of medical records from other medical institutions that sufficed to establish Carrie's behavior as a drug seeker.

{¶41} Assuming arguendo that Dr. Connell relied on the Marion General records in Exhibit 10, the record is devoid of any indication that the trial court relied on them in issuing its decision. In its judgment entry, the trial court cited to Carrie's visits to area hospitals, including Hardin Memorial Hospital and Wyandot Memorial Hospital, but never once mentioned her visit to or records from Marion General Hospital. Therefore, there is no indication of reliance by the trial court or by Dr. Connell on the records contained in Exhibit 10. Dr. Connell's cursory reference to Marion General Hospital records in no way "affects the basic fairness, integrity, or public reputation of the judicial process," nor does it "challeng[e] . . .

the legitimacy of the underlying judicial process itself." Id. Accordingly, we find Carrie's second assignment of error to be without merit and overrule it.

*Assignment of Error No. III*

{¶42} In her third assignment of error, Carrie asserts that the trial court's decision is against the manifest weight of the evidence. First, she argues that if the first two assignments of error are sustained, the weight of the evidence against her would be greatly emaciated. Second, she argues that she should not have been found in contempt of court for failing to render a hair sample and completing the court-ordered psychological evaluation. Absent the evidence in issue in her first and second assignments of error and the finding of contempt, Carrie argues, the outcome should have been different, and therefore the trial court erred.

{¶43} Initially we note this case is not one that calls for a manifest weight review. Rather, in legal custody proceedings the trial court's standard of review is a preponderance of the evidence standard. *Bixler,* 2006-Ohio-3533 at ¶24, citing *In re Nice* (2001), 141 Ohio App.3d 445, 455. "Preponderance of the evidence means evidence that's more probable, more persuasive or of greater probative value." *Bixler*, 2006-Ohio-3533 at ¶24 (internal citations omitted). On appeal, an appellate court will not reverse an award of legal custody absent an abuse of discretion. Id., citing *Nice*, 141 Ohio App.3d. at 455. Although Carrie asserts that

the trial court's decision was against the manifest weight of the evidence, she argues the correct legal standard, under which we will address her argument.

*Evidence from Assignments of Error Nos. I & II*

{¶44} As we have overruled Carrie's first two assignments of error and held that the evidence in dispute is admissible, Carrie's argument regarding the evidence in issue under these two assignments is moot. We decline to address this portion of her third assignment of error. App.R. 12(A)(1)(c).

*Contempt*

{¶45} Carrie argues that the trial court erred by finding her in contempt of court and that, without such finding, there may not have been an award of legal custody.

{¶46} The trial court found Carrie in contempt for failing to comply with the court's previous order to undergo a psychological evaluation and then sentenced her to ten days in the Wyandot County Jail. The trial court suspended the jail time "on the condition that Carrie purge herself of the contempt order by obtaining a psychological evaluation and a hair test analysis within the next thirty days…" Judgment Entry, p. 8. Carrie complied with the conditions of the purge and the trial court entered judgment vacating the jail sentence. As Carrie has purged herself of the finding of contempt, she no longer has standing to challenge the propriety of such finding. Further, Carrie has not assigned the finding of

contempt as error. We, therefore, hold that this argument is moot and decline to address it.

*Abuse of Discretion*

**{¶47}** A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. See *State v. Boles*, 2d Dist. No. 23037, 2010-Ohio-278, ¶¶17-18, citing Black's Law Dictionary (8 Ed.Rev.2004) 11. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219. Rather, an abuse of discretion will only be found where the decision is unreasonable, arbitrary, or unconscionable. Id.

**{¶48}** The evidence presented at trial clearly met and exceeded a preponderance standard. The lion's share of the testimony presented during the hearing supported the trial court's decision to grant legal custody to the grandparents. Dr. Connell testified that, based on his knowledge and experience, Carrie was addicted to narcotics as evidenced by her drug-seeking behavior, voluminous medical records, and visits to various emergency rooms requesting narcotics. Ms. Allison, the WCDJFS caseworker, testified that it is in J.T.'s best interest to be placed with the grandparents due to Carrie's failure to complete the psychological evaluation, her pattern of hospitalization, criminal activity, lack of

permanent housing, electricity shut-off notices, abuse of medications, and "doctor shopping." Hearing Tr., pp. 163-65. Deb testified that she believes it is in J.T.'s best interest to be placed with her and her husband as she has observed Carrie acting erratically and under the influence of drugs several times throughout the prior year. Ms. Hufford testified that, although Carrie had made recent improvements, she believes it is in J.T.'s best interest to be placed with the grandparents as J.T. needs a consistent, structured environment. Lastly, the record reflects voluminous medical records from various area medical institutions and drug test results that support the testimony of Carrie's drug-seeking behavior.

{¶49} In light of the testimony and evidence presented at trial, we cannot conclude that the trial court abused its discretion by awarding legal custody to the grandparents. Accordingly, we overrule Carrie's third assignment of error.

*Assignment of Error No. IV*

{¶50} In her fourth assignment of error, Carrie alleges that she received ineffective assistance of counsel. Specifically, Carrie asserts that her trial attorney failed to cross-examine Dr. Connell regarding his opinion excluding the records in Exhibit 10, and failed to provide any documentary or expert evidence regarding Carrie's medical history. Such evidence could have verified her medical issues, pain, and the side effects of certain medications she was taking. Carrie argues that

-26-

the trial attorney's failure to provide such evidence resulted in an unfair trial as substantial justice was not done.

{¶51} WCDJFS responds that Carrie's trial counsel was not ineffective as Carrie's assertions are speculative and fail to overcome the strong presumption that the trial attorney provided competent representation. Specifically, Wyandot County contends that trial counsel's decision on how to cross-examine a witness is soundly within trial strategy, that the trial counsel strongly objected to the admission of exhibits and successfully moved the court to exclude Exhibit 10, and that Carrie's assertions that medical records or testimony from her physician could have explained her voluminous medical records are mere speculation.

{¶52} In order to succeed on a claim of ineffective assistance of counsel, an appellant must "show that his trial counsel was deficient and that such deficiency prejudiced the defense." *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Specifically, an appellant must establish 1) that the trial counsel's representation fell below an objective standard of reasonableness, and 2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, adopted by Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. In reviewing the alleged deficiency of trial counsel, courts presume that a properly licensed attorney executes his duties in an ethical and competent manner. *State v. Smith*

(1985), 17 Ohio St.3d 98, 100, 477 N.E.2d 1128. The courts are to refrain from second-guessing the strategic decisions made by trial counsel. *State v. Sallie* (1998), 81 Ohio St.3d 673, 674.

**{¶53}** The deficiencies Carrie alleges fail to establish prejudice and overcome the presumption that is accorded licensed attorneys. Carrie asserts that her trial counsel should have done a more thorough cross-examination of Dr. Connell pertaining to his reliance on the records contained in Exhibit 10 in forming his opinion. As discussed above, Dr. Connell was instructed several times to exclude those records when testifying. Further, the trial counsel's approach to cross-examining a witness is soundly within trial strategy. *State v. Otte* (1996), 74 Ohio St.3d 555, 565, citing *State v. Brown* (1988), 38 Ohio St.3d 305, 319.

**{¶54}** Next, Carrie asserts that her trial counsel was deficient due to the lack of evidence presented. Specifically, Carrie asserts that her counsel's failure to provide any medical or dental records or her treating physician was prejudicial as such evidence would have substantiated her statements regarding her medical history, the pain typically associated with her conditions, and the side effects of medication. Although providing such evidence may have been beneficial to Carrie's defense, Carrie provides no documentation to establish that such evidence, if it in fact exists and favors her, would have changed the outcome of the

proceeding. Without any documentation as to the substance of such evidence, this Court is left with only speculation as to what such evidence would have revealed. Although it is possible such evidence would have changed the outcome of the case, Carrie's flat assertions do not establish that a different outcome would have been reasonably probable. Accord *In re N.H.*, 9th Dist. No. 24355, 2008-Ohio-6617 (reasoning that, without explaining what father's therapist's testimony would have been or demonstrating that the therapist's testimony would have changed the outcome of the proceeding, the father failed to establish ineffective assistance of counsel). Further, "[d]ecisions regarding the calling of witnesses are within the purview of defense counsel's trial tactics. *Matter of Coffey* (Jan. 26, 1998), 12th Dist. No. 97-05-021, citing *State v. Cantwell* (Nov. 24, 1997), 12th Dist. No. 97-02-018. Because Carrie has failed to demonstrate any prejudice resulting from the assistance of her trial counsel, we hold that her claim lacks merit. Accordingly, we overrule her fourth assignment of error.

{¶55} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW and WILLAMOWSKI, J.J., concur.**

**/jlr**

-29-