[Cite as *Heberling v. Deckard*, 2024-Ohio-1535.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HARDIN COUNTY

PATRICIA HEBERLING,

    CASE NO. 6-23-10

    PLAINTIFF-APPELLEE,

  v.

TAYLOR DECKARD,              O P I N I O N

    DEFENDANT-APPELLANT.

**Appeal from Hardin County Common Pleas Court
Domestic Relations Division
Trial Court No. AP 2020 4046**

**Judgment Affirmed**

**Date of Decision:  April 22, 2024**

**APPEARANCES:**

    *John C. Filkins* **for Appellant**

    *Kelle M. Saull* **for Appellee**

**MILLER, J.**

{¶1} This case involves the determination of custodial rights between a parent and a grandparent. Defendant-Appellant, Taylor Deckard ("Deckard"), appeals the May 2, 2023 judgment issued by the Hardin County Court of Common Pleas naming Plaintiff-Appellee, Patricia Heberling ("Heberling"), as the residential and legal custodian of Deckard's minor child ("L.D."). Deckard is L.D.'s biological father and Heberling is the child's maternal grandmother, who obtained custody of L.D. and his four half-siblings following the death of L.D.'s mother. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

### A. Parties and Case Initiation

{¶2} Heberling lives with her deceased daughter's five children, including L.D. As of the January 7, 2022 evidentiary hearing, those five children ranged in age from one to thirteen years old. Prior to her daughter's death, Heberling saw the children frequently and spoke daily to them and her daughter.

{¶3} L.D. is a young boy who was born in 2015. On May 3, 2020, L.D.'s mother was murdered by the father of her youngest child when all her children were present. The day after the murder, Heberling traveled to Georgia, where her daughter and the children had been living, in order to take custody of the children. She returned to Ohio and, on July 17, 2020, she filed a complaint in the Juvenile

-2-

Division of the Court of Common Pleas seeking legal custody of L.D. The same day, Heberling filed an emergency motion to temporarily designate her as L.D.'s sole custodial and residential custodian. On July 31, 2020, then-magistrate Maria Santo ("Santo") issued an ex parte order granting Heberling's emergency motion.

{¶4} On August 12, 2020, after Heberling filed her complaint for legal custody of L.D., Deckard filed an answer and a motion for paternity testing. On October 12, 2020, based on results of paternity testing, the trial court determined Deckard was L.D.'s father. The court appointed a Guardian Ad Litem ("GAL") and, by consent judgment entry on December 11, 2020, the parties agreed on incremental supervised parenting time to introduce Deckard to L.D.

**B.     Evidentiary Hearing Presided Over by Then-Magistrate Santo**

{¶5} On January 7, 2022, the matter proceeded to a final evidentiary hearing before then-magistrate Santo on Heberling's complaint for legal custody and Deckard's motion to be designated L.D.'s residential parent. During the hearing, numerous witnesses testified, including Heberling, Deckard, and Dr. Kimberly Stark (a clinical child psychologist). Although the GAL did not testify during the hearing, his report was admitted as an exhibit without objection.

{¶6} Among other things, the evidence at the hearing demonstrated L.D.'s mother had previously been granted a protection order against Deckard. Deckard did not appear for the hearing on that protection order. Deckard testified that the protection order against him was in effect for four years (as he understood it).

Deckard also testified he spoke with L.D.'s mother after the protection order expired; L.D.'s mother sent him pictures of L.D.; and they discussed possible visits between L.D. and Deckard, with the mother indicating such visits "maybe" could happen. However, Deckard admitted no visits actually occurred, Deckard and L.D.'s mother stopped talking, and Deckard never took any action to obtain visitation rights. Deckard also admitted he does not call, text, or FaceTime L.D. due to L.D's age, limited attention span, and distraction by other children. Deckard also acknowledged L.D. is strongly bonded with his siblings, who live with Heberling. Deckard said he wants L.D. to live with him, but not immediately; he suggested progressively increasing their time together.

{¶7} Dr. Stark testified she began seeing L.D. on September 21, 2020. Their sessions together initially were held each week, but were reduced to bi-weekly sessions because of L.D.'s improvement. Dr. Stark diagnosed L.D. with "stressor-related disorder" and treated him for severe trauma due to witnessing his mother's murder. In Dr. Stark's opinion, Heberling and L.D.'s siblings create an environment of safety and protection for L.D. and are a "neurological bond" for him. This "secure attachment" tells L.D. that he is going to be okay and has built resiliency in him. According to Dr. Stark, Heberling and the environment of living with her and his siblings provided L.D. with security or a "secure base." Dr. Stark testified that Deckard told her he had no relationship with L.D. since the time the child was six months old, which corresponds with the protection order being issued. Although

L.D. does things with Decker that he likes and has fun, Dr. Stark testified L.D. tolerates his visits with Decker because he knows he will be returning to the security of Heberling and his secure base. Dr. Stark explained that removing L.D. from his secure base could result in more severe trauma than a single significant traumatic event. She further explained this "disrupted attachment" could result in long-term issues for L.D. as an adult, such as depression, addiction, and loss of self-esteem.

{¶8} According to the GAL's report, L.D. sees Heberling as his primary source of stability. L.D. is integrated into her home, has a close bond with his siblings, attends a local school, is progressing well, and has no behavioral issues at school. The report indicated the GAL had multiple conversations with Dr. Stark, who believed L.D.'s lack of post-traumatic stress disorder (PTSD) was because L.D. understood he would always be returning to Heberling and his siblings. Dr. Stark consistently reported to the GAL that L.D. did not want to live with Deckard. Additionally, the report stated the child clearly expressed his desire to remain with his siblings in Heberling's home. The report's conclusion was that the court's temporary order be maintained as the ongoing order of the court and, based on Dr. Stark's professional opinion, removing L.D. from Heberling's home would be detrimental to L.D.'s mental health.

{¶9} The GAL's report also explained how L.D.'s parents had a turbulent relationship. Among the issues was that Deckard had left L.D.'s mother menacing messages, including threats to kill her. The turbulent relationship resulted in L.D.'s

mother obtaining a civil protection order for a two-year period (August 2015 to August 2017), which included the then-seven-month-old L.D. as a protected person.

**{¶10}** At the conclusion of the hearing, Magistrate Santo found that the matter was submitted and recessed the court.

### C.     Post-Hearing Events

**{¶11}** It is undisputed that, after the January 7, 2022 evidentiary hearing over which she had presided, then-magistrate Santo was elected judge of the Common Pleas Court of Hardin County, Domestic Relations Division.[1]  Santo took the bench in that position effective January 1, 2023.  It also is undisputed that Santo did not issue a magistrate's decision following the January 7, 2022 final evidentiary hearing.

**{¶12}** On April 21, 2023, Deckard filed a motion with the trial court titled "Defendant's Motion for the Court to Issue a Decision Following the Final Hearing Held on January 7, 2022."  (Apr. 21, 2023 Motion).  In that motion, Deckard "respectfully move[d] the Court for issuance of a decision from the final hearing held on January 7, 2022." (*Id.*).  Deckard requested "an immediate decision." (*Id.*).

---

[1] The Domestic Relations Division of the Hardin County Common Pleas Court was newly-created by the legislative enactment of R.C. 2301.03(FF), with a new judgeship beginning on January 1, 2023.  Santo, the new judge, assumed responsibilities for the docket of the Juvenile Division at that time.

Case No. 6-23-10

**{¶13}** On May 2, 2023, now-judge Santo issued a Judgment Entry ruling on Heberling's complaint for legal custody and Deckard's motion to be designated the residential parent of L.D. Judge Santo issued the Judgment Entry as a judge, not as a magistrate. (*See* May 2, 2023 Judgment Entry at 1, 14). The judgment entry explained that the custody dispute fell under R.C. 2151.23(A)(2), not R.C. 3109.04, because it did not involve parents in a divorce action.[2] (*Id.* at 1). The judgment entry made the following findings and conclusions:

> It is undisputed that the parties have a poor relationship, do not communicate and have been unable to bury the hatchet from the past. Although they do follow court orders, they are unwilling to deviate even the slightest.
>
> It is further undisputed that the child was already bonded with his siblings and Grandmother [Heberling] prior to his mother's death and that his Grandmother, not his Father [Deckard], is his secure, comfort zone.
>
> No evidence was presented that refuted the professional opinion of Dr. Stark that * * * placing the child with his Father could be more traumatic than the trauma he experienced by witnessing his mother's murder.
>
> [Dr. Stark] is very concerned of the child developing disruptive attachment by removing him from his secure environment with his Grandmother and siblings and that could result in long term issues as an adult.
>
> Additionally, the GAL concluded that removing the child from his Grandmother's home would be detrimental to his mental health based upon numerous conversations with Dr. Stark.

---

[2] *See In re Perales*, 52 Ohio St.2d 89, 96, 369 N.E.2d 1047 (1977) ("R.C. 3109.04 deals with custody disputes arising out of divorce actions"); *Scavio v. Ordway*, 3d Dist. Shelby No. 17-09-07, 2010-Ohio-984, ¶ 18 (explaining how child custody dispute jurisdiction arises under one of two separate statutes, and R.C. 2151.23(A)(2) "typically encompasses all custody disputes between parents and non-parents").

The child has just begun bonding with his Father, which is solely the result of the domestic violence by the Father resulting in a protection order. Additionally, the lack of involvement in this child's life is due to the Father's failure to seek parental rights after the expiration of the protective order. Whether the Father would have ever done so if the mother had not been murdered is questionable.

Based on this uncontroverted evidence, the extent and magnitude of the harm likely to be experienced by the child being placed with his natural parent would clearly be detrimental. Therefore, the Father is legally unsuitable to be designated as the residential parent.

Moreover, it is noteworthy that the Father testified that he did not want[] the child to live with him immediately and suggested progressively increasing time * * *.

It is therefore ORDERED, ADJUDGED AND DECREED that the Father's motions to dismiss and to be designated the residential parent are denied and the Grandmother be and hereby is designated the Legal Custodian of the minor child * * *.

(May 2, 2023 Judgment Entry at 11-13). The judgment entry went on to grant

Deckard periodic parenting time. (*Id.* at 13-14). This appeal followed.

## II.    ASSIGNMENTS OF ERROR

{¶14} Deckard raises two assignments of error for our review:

### First Assignment of Error

**Following a full and final evidentiary hearing before the magistrate on January 7, 2022, the trial court erred when it failed to issue a magistrate's decision and instead issued a final judgment entry on May 2, 2023 thereby denying to either party the right to receive a magistrate's decision or the right to file objections to a magistrate's decision.**

### Second Assignment of Error

**The trial court erred in refusing to accord the appellant the preferential treatment required to be afforded a natural parent as set forth in *In re***

*Perales* **and erred in its conclusion that Appellant was unsuitable to be designated as the residential parent and legal custodian of his son.**

## III. DISCUSSION

### A. First Assignment of Error

{¶15} In the first assignment of error, Deckard argues "that the parties were denied procedural due process as provided for under Ohio Civil Rule 53" because Judge Santo issued a final judgment entry without the parties being provided with a magistrate's decision and the opportunity to file written objections to a magistrate's decision. (Appellant's Brief at 10-11). Deckard asserts that "the only viable option" now is for the May 2, 2023 Judgment Entry "to be set aside and for the case to be retried before a different judge assigned to hear the matter." (*Id.* at 12).

{¶16} We disagree. First, Deckard has not shown the trial court's May 2, 2023 Judgment Entry was issued in contravention to Civ.R. 53. Second, even if it was, Deckard has not shown that he suffered any prejudice as a result of the former magistrate, who presided over the evidentiary hearing and then became the trial judge, issuing the order. Third, Deckard invited the procedure that he now alleges was erroneous.

#### 1. Applicable Law

{¶17} The purpose of a magistrate is to assist the trial court in managing its docket. *See* Civ.R. 53(C)(1); *Dixon v. O'Brien*, 7th Dist. Mahoning No. 09 MA 123, 2011-Ohio-3399, ¶ 19 (the scheme devised by Civ.R. 53 is a docket

-9-

management tool to aid trial judges by permitting select matters to be resolved by magistrates); *In re A.C.*, 5th Dist. Licking No. 23CA00040, 2023-Ohio-3072, ¶ 44 (a magistrate is an arm of the court, not a separate judicial entity with independent judicial authority and duties). Civil Rule 53 allows, but does not require, a court of record to appoint one or more magistrates and refer certain legal disputes to those magistrates. Civ.R. 53(A), (D)(1). Pursuant to Civ.R. 53(D)(3)(a)(i), "[s]ubject to the terms of the relevant reference, a magistrate shall prepare a magistrate's decision respecting any matter referred under Civ.R. 53(D)(1)." Another portion of Civ.R. 53(D)(3) allows a party to file written objections to a magistrate's decision and sets forth requirements for such objections, including when they must be filed. *See* Civ.R. 53(D)(3)(b). Additionally, Civ.R. 53(D)(4) governs a trial court's actions following issuance of a magistrate's decision and any objections to a magistrate's decision.

{¶18} A trial court is not required to refer a matter to a magistrate. Civ.R. 53(D)(1)(a) indicates that "[a] court of record *may*, for one or more of the purposes described in Civ.R. 53(C)(1), refer a particular case or matter or a category of cases or matters to a magistrate by a specific or general order of reference or by rule." (Emphasis added). If a trial court refers a matter to a magistrate, then the court may limit the magistrate's powers as detailed in Civ.R. 53(D)(1)(b), remove a magistrate from a referred matter as authorized by Civ.R. 53(D)(6), or recall the referenced matter entirely and preside over the case itself. *See Ordway v. Ordway*, 9th Dist.

Wayne No. 97CA006947, 1999 WL 1789, *1-2 (Dec. 30, 1998) (as a matter of judicial economy, the trial court is permitted to withdraw an issue or matter from a magistrate at any time).

### 2. Analysis

{¶19} In her role as a magistrate, Santo presided over the January 7, 2022 final evidentiary hearing. No magistrate's decision was ever issued. Following her election to the common pleas bench and Deckard's motion requesting the court issue a decision, Santo issued the May 2, 2023 Judgment Entry in her current position as judge.

### i. No violation of Civ.R. 53

{¶20} We do not find that the trial court violated Civ.R. 53. The Civil Rules do not specifically provide any procedure for courts of record to employ when a magistrate does not complete his or her duties as a result of the magistrate becoming the judge of the court. Further, nothing in Civ.R. 53 expressly prohibits the procedure employed in the unique circumstances of this case.

{¶21} As set forth above, a trial court is not required to refer a matter to a magistrate, and a trial court can withdraw an issue or matter from a magistrate at any time. Consequently, a party in a court proceeding has neither the "right" to have a matter heard by a magistrate nor the "right" to a magistrate's decision. Judge Santo issuing the May 2, 2023 Judgment Entry in her capacity as the newly-elected judge of the court was tantamount to her recalling the matter from the magistrate's

docket. As the judge who assumed responsibility and control of the docket, this was entirely within Judge Santo's purview and the parameters of Civ.R. 53. *In re A.C.*, 2023-Ohio-3072, at ¶ 43 (a trial court retains its authority to decide an issue independent of the magistrate; the grant of authority to a magistrate does not affect a trial court's jurisdiction). Accordingly, Judge Santo was able to act with full authority to decide the issues she had heard as magistrate.

**{¶22}** Additionally, "Civ.R. 53 contemplates that the magistrate's decision will include a statement of the basis of his or her findings and recommendations *in order to provide the trial court with sufficient information to make its own independent analysis of the decision's validity*." (Emphasis added.) *In re Bortmas*, 11th Dist. Trumbull No. 98-T-0147, 1999 WL 959842, *2 (Oct. 15, 1999). In other words, in its role of assisting the court, a magistrate's decision informs the trial judge of the relevant evidence the magistrate heard, the factual findings based on that evidence, and the magistrate's recommendations to the judge.

**{¶23}** Here, however, there was no longer any need for a magistrate's decision once the magistrate became the judge. The purpose of a magistrate's decision is to allow the trial court to make its own independent analysis of the decision's validity. *Erb v. Erb*, 65 Ohio App.3d 507, 509, 584 N.E.2d 807 (9th Dist.1989). Because she presided over the evidentiary hearing, Judge Santo obviously could make her own analysis. The need for a magistrate's report to assist the trial court in making an independent analysis by providing sufficient information

is eliminated when the trial judge is the same person who presided over the hearing, albeit as the court's former magistrate. The trial court's decision was not in contravention of Civ.R. 53.

### ii. Even if the trial court did not comply with Civ.R. 53, Deckard has not shown prejudice

**{¶24}** Even if the procedure Judge Santo employed after assuming the trial bench was erroneous, Deckard has failed to show that he suffered any prejudice. "'A trial court may not be reversed for failure to comply with Civ.R. 53 unless the appellant shows [1] that the alleged error has merit *and* [2] that it prejudiced the appellant.'" (Emphasis added.) *Performance Constr., Inc. v. Carter Lumber Co.*, 3d Dist. Hancock No. 5-04-28, 2005-Ohio-151, ¶ 14, quoting *Stout v. Stout*, 3d Dist. Union No. 14-01-10, 2001 WL 1240131, *3 (Oct. 17, 2001). In accordance with this standard, the failure to issue a magistrate's decision does not call for automatic reversal. *E.g., Sladek v. Sladek*, 11th Dist. Portage No. 2011-P-0029, 2012-Ohio-529, ¶ 26-28 ("the magistrate held a hearing in this case but did not issue a Magistrate's Decision," yet appellant failed to show she "was prejudiced by the magistrate's failure to issue a decision"); *In re A.C.*, 2023-Ohio-3072, at ¶ 42 (affirming judgment even though "a magistrate presided over the two-day hearing but did not issue a Magistrate's Decision").

{¶25} While Civ.R. 53(D)(3)(a)(i) mandates that a magistrate prepare a magistrate's decision regarding a referenced matter, no prejudice resulted from the failure to strictly comply with the rule given the particular circumstances here, which involved the magistrate's election as judge. This is *not* a situation where a magistrate presided over the evidentiary hearing and then a different person—who did not observe the witnesses or hear the testimony during the hearing—entered the judgment. *Compare In re Bortmas*, 1999 WL 959842, at *2 (finding prejudice where "the trial court judge * * * did not, itself, conduct a hearing on the issues" yet entered judgment without a magistrate's decision having been filed); *Erb*, 65 Ohio App.3d at 508-509 (same). In line with the purpose of a magistrate's decision, the concern with the trial court having a lack of information to decide the matter simply does not apply here. As the judicial officer who presided over the evidentiary hearing, Judge Santo had her own personal observations of the testimony and credibility assessments of the witnesses on which she could rely to base her decision.

{¶26} Ultimately, the scenario that unfolded is no different than if the matter simply had never been referred to a magistrate: the trial court judge presides over the evidentiary hearing; the trial court judge issues a judgment; and—if they decide to do so—one or more of the parties appeals the judgment to the court of appeals. *See* Civ.R. 53(D)(1)(A) (allowing, but not requiring, a judge to refer a matter to a magistrate). The parties received equal treatment throughout this process. Neither

had an advantage over the other and neither was prejudiced by the process employed by Judge Santo. Deckard's loss in the trial court was not caused by any unfair advantage obtained by Heberling as a result of the magistrate becoming the judge responsible for the case.

{¶27} Deckard contends the parties were denied the "right" to receive a magistrate's decision and the "right" to file objections to a magistrate's decision. (Appellant's Brief at 11). There is no support indicating such a "right" exists and Deckard cites none. Rather, these procedural steps are applicable only when a matter is referred to a magistrate. The ability to object to a magistrate's decision and obtain an independent review of that decision is a procedure defined by the Civil Rules. There is no "right" to a magistrate's decision. This is merely a procedure created by Civ.R. 53(D)(3)(a) to benefit the trial court in rendering a final decision. The same is true for the ability to file objections to a magistrate's decision or request that it be set aside. This procedure is authorized in Civ.R. 53(D)(3)(b). Ultimately, Deckard was not denied any "rights" but was afforded a full and fair hearing before a neutral jurist who heard the evidence and then, through the peculiar circumstances of this case, issued the final decision. Further, Deckard's ability to seek appellate review of that decision is self-evident.

{¶28} Judge Santo's decision to proceed and issue a judgment in her capacity as judge was a permissible, common sense approach to a relatively unique situation. Civ.R. 1(B) provides, "These rules shall be construed and applied to effect just

results by eliminating delay, unnecessary expense and all other impediments to the expeditious administration of justice." Judge Santo's decision eliminated further delay and unnecessary expense for the parties. This contrasts with Deckard's request that the case "be retried before a different judge assigned to hear the matter." (Appellant's Brief at 12). Arguably, such a procedure also would prejudice Heberling by affording Deckard a "second bite at the apple." Because Judge Santo has already heard and considered the evidence, such a procedure would only create delay and expense for the parties, not to mention L.D., if the case were retried. Such redundancy is contrary to the stated objective of the Civil Rules.

### iii. Deckard invited the procedure used by the court

{¶29} Finally, even if the procedure Judge Santo employed after assuming the trial bench was erroneous, it tracked Deckard's own request. In other words, Deckard invited the alleged error about which he now complains. Under the doctrine of invited error, "a party is not permitted to take advantage of an error that he himself invited or induced the court to make." *Davis v. Wolfe*, 92 Ohio St.3d 549, 552, 751 N.E.2d 1051 (2001). The doctrine is a branch of the waiver doctrine. *Id.*; *see also In re J.B.*, 10th Dist. Franklin No. 11AP-63, 2011-Ohio-3658, ¶ 10 ("a party cannot complain of any action taken or ruling made by the court in accordance with that party's own suggestion or request").

**{¶30}** Deckard's April 21, 2023 motion filed with the trial court identified Judge Santo in the caption. (Apr. 21, 2023 Motion). In that motion, Deckard "respectfully move[d] the Court for issuance of a decision from the final hearing held on January 7, 2022" and requested "an immediate decision." (*Id.*). He did not ask for a new judge or magistrate to be assigned or for a new judge or magistrate to preside over a new evidentiary hearing. In fact, the motion indicates Deckard had "requested a telephonic pre-trial with the Court and counsel" and that such conference was held on January 25, 2023, after the magistrate had assumed her duties as the trial judge. (*Id.*). There is nothing in the record indicating Deckard objected to Judge Santo issuing the final decision.

**{¶31}** Therefore, the invited-error doctrine applies, resulting in Deckard waiving the right to argue any error occurred as a result of the trial court doing what he asked it to do. *E.g., Sizemore v. Gen. Motors Co.*, 9th Dist. Medina No. 11CA0025-M, 2012-Ohio-4003, ¶ 10 (where plaintiff argued on appeal that the trial court erred by dismissing a defendant, but plaintiff had moved the trial court to dismiss that defendant, plaintiff "cannot now be heard to complain that the trial court did what she asked it to do" and waived the right to argue that any error occurred as a result); *State v. Campbell*, 90 Ohio St.3d 320, 324, 738 N.E.2d 1178 (2000) (the invited error doctrine applies "when a party has asked the court to take some action later claimed to be erroneous"); *Smarrella v. Smarrella*, 7th Dist. Jefferson No. 14 JE 18, 2015-Ohio-837, ¶ 75 (applying the principle from *Campbell*

to a dispute involving the determination of the custodial and residential parent for minor children).

**{¶32}** Deckard's first assignment of error is overruled.

## B.       Second Assignment of Error

**{¶33}** In the second assignment of error, Deckard argues the trial court erred in concluding he was unsuitable to be designated as the residential parent and legal custodian of his son, L.D.  He specifically says Heberling "did not establish by a preponderance of the evidence that [Deckard] was unsuitable and likewise failed to establish, by a preponderance of the evidence, that there existed a probability of detriment or harm to the child by designating [Deckard] as the residential parent." (Appellant's Brief at 16).  Deckard also argues "it would be error to conclude [he] has abandoned" L.D.  (*Id.* at 13).

### 1.       Applicable Law

**{¶34}** Custody proceedings between a parent and a nonparent under R.C. 2151.23(A) "bring into play the right of the parent to rear his own child." *In re Perales*, 52 Ohio St.2d 89, 96, 369 N.E.2d 1047 (1977).  Yet, the first interest is the welfare of the child.  *Id.* at 98; *see also Reynolds v. Goll*, 75 Ohio St.3d 121, 123, 661 N.E.2d 1008 (1996) ("in balancing the interests of both the parent and child, the right of custody by the biological parents is not absolute and can be forfeited").  Thus, "'in all cases of controverted right to custody, the welfare of the minor is first to be considered,' but * * * parents who are 'suitable' persons have a 'paramount'

-18-

right to the custody of their minor children unless they forfeit that right by contract, abandonment, or by becoming totally unable to care for and support those children." *In re Perales* at 97, quoting *Clark v. Bayer*, 32 Ohio St. 299, 310 (1877); *see also In re Mullen*, 129 Ohio St.3d 417, 2011-Ohio-3361, ¶ 11 ("the parents' right to custody of their children is paramount to any custodial interest in the children asserted by nonparents"). The parent's interest is recognized "by limiting the reasons for which parents may be denied the custody of their children." *In re Perales* at 98.

{¶35} Therefore, in child custody disputes between a parent and a nonparent under R.C. 2151.23(A)(2), "the hearing officer may not award custody to the nonparent without first making a finding of parental unsuitability that is, without first determining that a preponderance of the evidence shows [1] that the parent abandoned the child, [2] that the parent contractually relinquished custody of the child, [3] that the parent has become totally incapable of supporting or caring for the child, or [4] that an award of custody to the parent would be detrimental to the child." *In re Perales* at syllabus. "If a court concludes that any one of these circumstances describes the conduct of a parent, the parent may be adjudged unsuitable, and the state may infringe upon the fundamental parental liberty interest of child custody." *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, ¶ 17. "The nonparent seeking custody bears the burden of demonstrating that the parent is unsuitable." *Depinet v. Norville*, 3d Dist. Wyandot No. 16-19-04, 2020-Ohio-3843,

¶ 14. "A preponderance of the evidence is defined as that measure of proof that convinces the judge or jury that the existence of the fact sought to be proved is more likely than its nonexistence." *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, ¶ 54.

{¶36} In assessing the fourth circumstance (i.e., whether there is a preponderance of the evidence showing that an award of custody to the parent would be detrimental to the child), the focus is on the potential harmful effect on the child. *In re Dunn*, 79 Ohio App.3d 268, 271, 607 N.E.2d 81 (3d Dist.1992) ("if the unsuitability is based on detriment to the child, courts must measure suitability in terms of the harmful effect on the child, not in terms of society's judgment of the parent"); *In re M.N.*, 6th Dist. Lucas No. L-15-1317, 2016-Ohio-7808, ¶ 13 ("'[d]etrimental' means some type of harm is or can be suffered by the child"). "Simply because one situation or environment would" be better "does not mean the other is detrimental or harmful to the child." *In re Porter*, 113 Ohio App.3d 580, 589, 681 N.E.2d 954 (3d Dist.1996).

{¶37} When making this assessment, "the trial court must avoid making a determination based purely on the best interest of the child." *In re M.N.* at ¶ 13. Instead, the court should consider the extent and magnitude of harm the child is likely to experience if placed with his or her natural parent. *Id.* Potentially relevant to this consideration is evidence regarding, for example: the parent's history of abuse of the child or of his or her other children, history of failing to meet his or her

children's needs, or lack of involvement with the child or with his or her other children; the child experiencing fear in the parent's home; and whether the child had been living with individuals with whom he or she has established long and significant relationships. *See id.* at ¶ 14; *Liles v. Doyle*, 3d Dist. Allen No. 1-13-48, 2014-Ohio-1681, ¶ 47-48; *In re S.E.*, 8th Dist. Cuyahoga No. 96031, 2011-Ohio-2042, ¶ 16; *Butts v. Hill*, 5th Dist. Licking No. 11-CA-46, 2011-Ohio-5512, ¶ 53-55. This list is not exhaustive. *Id.* Additionally, "Ohio case law permits a trial court to make a finding [of] parental unsuitability where there are incidents of domestic violence." *Titus v. Titus*, 3d Dist. Logan No. 8-18-19, 2018-Ohio-4548, ¶ 14.

**{¶38}** The power of the trial court to exercise discretion is especially important in proceedings involving the custody and welfare of children. *Reynolds*, 75 Ohio St.3d at 124. "[T]he trial court, after carefully listening to the testimony of the parties and witnesses, is in the best position to judge their credibility and to determine whether a parent" is unsuitable. *Id.* "Therefore, absent an abuse of discretion, a reviewing court must uphold the trial court's decision." *Liles*, 2014-Ohio-1681, at ¶ 17 (affirming trial court's decision to award legal custody of minor child to a nonparent instead of a parent). "An abuse of discretion will be found only where the decision is unreasonable, arbitrary, or unconscionable." *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

### 2.    Analysis

**{¶39}** The May 2, 2023 judgment did not make an express finding of abandonment, contractual relinquishment of custody, or total inability to provide care and support.  Instead, it found "the extent and magnitude of the harm likely to be experienced by the child [L.D.] being placed with his natural parent [Deckard] would clearly be detrimental" and, "[t]herefore, the Father is legally unsuitable to be designated as the residential parent."  (May 2, 2023 Judgment at 12).  Thus, our analysis will focus only on the issue of detriment to the child, i.e., the fourth circumstance identified in *In re Perales* for finding parental unsuitability.

**{¶40}** We disagree with Deckard's assertion that "no evidence or testimony was presented to establish [he] is unsuitable to be designated as the residential parent and legal custodian of the child."  (Appellant's Brief at 14).  Among other evidence presented at the evidentiary hearing:

- Deckard admitted L.D.'s mother was granted a protection order against him for a period of years after L.D. was born;

- the GAL reported L.D.'s parents had a turbulent relationship that resulted in L.D.'s mother obtaining a civil protection order against Deckard for a two-year period (August 2015 through August 2017) that included the then-seven-months-old L.D. as a protected person;

- the GAL reported Deckard had left L.D.'s mother menacing messages, including threats to kill her;

- Deckard acknowledged L.D. was strongly bonded with his siblings, who live with Heberling;

- L.D. and the siblings all were present in the apartment where and when their mother's murder occurred;

- Dr. Stark diagnosed L.D. with stressor-related disorder;

- Dr. Stark opined that Heberling and L.D.'s siblings create an environment of safety for L.D. and were a neurological bond for him;

- Dr. Stark determined Heberling was the one who has provided L.D. with a sense of security since his mother's murder;

- Dr. Stark indicated that removing L.D. from his secure base with Heberling and his siblings (none of whom are Deckard's children) would disrupt the secure attachment, could be more traumatic for L.D. than an instance of severe trauma, and could result in long-term issues for L.D. as an adult (such as depression, addiction, and loss of self-esteem);

- the GAL likewise believes L.D. sees Heberling as his primary source of stability, that L.D. is integrated into Heberling's home, and L.D. has a close bond with his four siblings also living with Heberling; and

- the GAL believes removal of L.D. from Heberling's home would be detrimental to L.D.'s mental health.

Additionally, Deckard did not testify he ever visited L.D. when L.D.'s mother was alive or that he ever took any action to obtain visitation prior to Heberling filing the complaint in this case. (*See* May 2, 2023 Judgment at 8). Consideration of these evidentiary items collectively supports the trial court's finding of parental unsuitability based on determining that a preponderance of the evidence shows an award of custody to Deckard would be detrimental to L.D. *Titus*, 2018-Ohio-4548, at ¶ 13-17 (affirming trial court's finding that awarding custody of minor child to appellant-father would be detrimental to the child, where the child's mother had obtained a civil protection order to protect herself and the child from appellant-

father); *In re T.P.*, 9th Dist. Summit No. 27483, 2015-Ohio-1628, ¶ 22 (affirming custody of minor child to maternal grandmother where the trial court found, among other things, that appellant-father had been violent toward the child's mother).

**{¶41}** Also, Heberling testified she was not opposed to Deckard being involved in L.D.'s life and actually believed it important for Deckard to be involved in L.D.'s life. (*See* May 2, 2023 Judgment at 7; Jan. 7., 2022 Tr. at 105-106). This further supports the trial court's judgment, which affords Deckard increased periodic parenting time.

**{¶42}** Deckard argues Dr. Stark was never qualified as an expert under Evid.R. 702(B), and she never testified her opinions were being rendered to a "reasonable degree of medical or psychiatric certainty," so her opinions were not allowed to "be considered under the Evidence Rules." (Appellant's Brief at 15-16). However, the Rules of Evidence did not apply to the January 7, 2022 hearing. The hearing was a dispositional hearing involving a case of legal custody. *See* Juv.R. 2(B), (O), (X), and (CC) (separately defining "adjudicatory hearing," "dispositional hearing," "legal custody," and "permanent custody"); *In re J.T.*, 3d Dist. Wyandot No. 16-10-12, 2011-Ohio-3435, ¶ 32-33 (explaining that the hearing preceding the judgment granting legal custody of minor son to grandparent instead of parent was a dispositional hearing). Therefore, "Juv.R. 34(B)(2) applies rather than the Rules of Evidence." *In re J.T.* at ¶ 33. Under that rule, at a dispositional hearing, except as provided in its division (I), "the court may admit evidence that is material and

relevant, including, but not limited to, hearsay, opinion, and documentary evidence." Juv.R. 34(B)(2); *see also* Juv.R. 34(I) ("[t]he Rules of Evidence shall apply in hearings on motions for permanent custody"); *In re A.E.*, 9th Dist. Lorain No. 17CA011192, 2018-Ohio-2349, ¶ 1, 12 (in an appeal from a judgment placing appellant-mother's children in the legal custody of nonparents, "[h]earsay evidence was admissible at the legal custody hearing because the rules of evidence do not apply at dispositional hearings other than a hearing on a motion for permanent custody"). Dr. Stark's testimony at issue was material and relevant; Deckard does not argue otherwise.[3] *See In re Gardner*, 12th Dist. Butler No. CA94-12-221, 1995 WL 577671, *3 (Oct. 2, 1995) (trial court did not err in considering medical reports from minor child's treating doctor during hearings on parent's motion for legal custody because "such reports were material and relevant" and "the rules of evidence do not apply at the hearings").

**{¶43}** Deckard also asserts the trial court erred in refusing to give him "the preferential treatment required to be afforded a natural parent." (Appellant's Brief at 12). We disagree. The trial court expressly acknowledged in its May 2, 2023 judgment: "Parents who are suitable have a paramount right to custody of their minor children. *In re J.L.H.*, 5th Dist. Stark 2010CA00266, 2011-Ohio-5586, at ¶ 46, citing *Perales*." (May 2, 2023 Judgment at 2). The trial court then proceeded

---

[3] None of the cases Deckard cited in support of this argument are juvenile cases.

to explain that, in accordance with the law, this paramount right is not absolute and can be forfeited. (*Id.*). The trial court's analysis in the May 2, 2023 judgment, as well as our analysis of the overarching issue of custodial rights between a parent and nonparent, fail to support Deckard's assertion.

**{¶44}** "Custody determinations are some of the most difficult and agonizing decisions a trial court must make, and, therefore, an appellate court must grant wide latitude in its consideration of the evidence." *Scavio v. Ordway*, 3d Dist. Shelby No. 17-09-07, 2010-Ohio-984, ¶ 17 (affirming trial court's decision to award legal custody of minor child to a parent instead of a nonparent). We find the trial court did not abuse its discretion in determining that Heberling showed, by a preponderance of the evidence, that Deckard was unsuitable to be designated the residential parent and legal custodian of L.D. *Reynolds*, 75 Ohio St.3d at 124-25 (affirming award of custody to nonparents instead of biological father; evidence supporting unsuitability of appellant-parent included testimony from the GAL, court investigator, and psychologist, who each agreed appellee-nonparent should be granted custody while acknowledging appellant should be granted liberal visitation). Deckard's second assignment of error is overruled.

## IV. CONCLUSION

**{¶45}** For the foregoing reasons, Deckard's assignments of error are overruled. Having found no error prejudicial to the appellant in the particulars

assigned and argued, we affirm the judgment of the Hardin County Court of Common Pleas.

**Judgment Affirmed**

**WILLAMOWSKI, P.J., concurs.**

**WALDICK, J., dissents.**

For the reasons set forth in my dissenting opinion in *Vance v. Vance*, 3d Dist. Seneca No. 13-23-07, 2024-Ohio-____, I respectfully dissent in the disposition of the first assignment of error. I would sustain the first assignment of error, and would reverse and remand the case for further proceedings.

/hls