[Cite as *Frankart v. Phillips*, 2025-Ohio-2299.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

ZACHARY M. FRANKART,

    PLAINTIFF-APPELLEE,

  v.

SYDNIE A. PHILLIPS,

    DEFENDANT-APPELLEE,

  -AND-

WILLIAM M. FRANKART,

    INTERVENER-APPELLANT.

CASE NO. 13-24-36

**OPINION AND
JUDGMENT ENTRY**

Appeal from Seneca County Common Pleas Court
Domestic Relations Division
Trial Court No. 19 DR 0164

**Judgment Affirmed**

**Date of Decision: June 30, 2025**

APPEARANCES:

    *Dean Henry* **for Appellant**

    *John M. Kahler, II* **for Appellee Sydnie Phillips**

**WALDICK, P.J.**

{¶1} Intervener-appellant, William M. Frankart ("William"), appeals the September 3, 2024 decision of the Seneca County Court of Common Pleas, Domestic Relations Division, denying his motion for legal custody of his grandchild, J.F., and designating defendant-mother-appellee, Sydnie A. Phillips ("Sydnie"), as the residential parent and legal custodian of J.F.  For the reasons that follow, we affirm.

*Background*

{¶2} J.F. was born in January of 2020. Her parents are Zachary Frankart ("Zachary") and Sydnie. In 2020, Zachary and Sydnie divorced and they originally agreed to a shared parenting plan. Subsequent visitation disputes led both parties to file motions to terminate the plan and to be designated as J.F.'s residential parent and legal custodian.

{¶3} In 2022, Zachary was charged with numerous felony sexual assault crimes in Butler County. After Sydnie learned of the charges, and after having the aforementioned visitation disputes, Sydnie absconded with J.F. for several months in June of 2022. During the summer of 2022, Sydnie took J.F. to Kentucky, West Virginia, and Pennsylvania in an attempt to obscure their whereabouts.

{¶4} When Sydnie did not return J.F. to Zachary for his visitation, Zachary sought and received temporary custody of J.F. on July 18, 2022. However, before

the order could be served on Sydnie, Zachary was convicted of attempted rape and sentenced to prison.

{¶5} Following Zachary's conviction for attempted rape and his subsequent incarceration, William, J.F.'s paternal grandfather, filed a motion to intervene in the matter on September 8, 2022, which the trial court granted. Contemporaneously, Zachary moved the court for a (self-executing) order granting temporary custody of J.F. to William. The trial court granted the requested relief and directed Sydnie to relinquish custody of J.F. to William.

{¶6} William engaged the services of a private investigator to track Sydnie's movements. Once Sydnie learned that William was granted temporary custody of J.F., and she spoke to her attorney, Sydnie returned to Ohio and turned J.F. over to William on September 12, 2022. Sydnie was convicted of "interference with custody" as a result of her actions.

{¶7} Sydnie subsequently filed for reallocation of parental rights and responsibilities, seeking termination of the shared parenting plan and designation as J.F.'s residential parent and legal custodian. Sydnie further moved to set aside the trial court's prior order granting temporary custody of J.F. to William.

{¶8} On December 5, 2022, William requested that the trial court appoint J.F. a guardian ad litem ("GAL"), which the trial court granted.

{¶9} On December 9, 2022, William filed a motion requesting legal custody of J.F. Thereafter, on December 29, 2022, the parties consented to the entry of an

order designating William as J.F.'s temporary legal custodian. Sydnie was awarded supervised parenting time at "Patchworks House" or at William's home "as the parties may agree." Sydnie exercised her supervised parenting time at Patchworks House, flying in from as far as California to exercise her parenting time, but when she requested to meet outside of Patchworks House, William would not agree.

{¶10} A hearing was held on the pending motions on February 15-16, 2024, and May 20, 23, 2024. At the hearing, Sydnie testified that she worked as a specialized welder and that she made the most money by "chasing the shutdowns," or working temporarily in other areas. At her current rate, she was making between $150,000 and $200,000 per year.

{¶11} During the February 2024 hearings, Sydnie was living in California and she testified she intended to stay there; however, by the May 2024 hearing dates she had moved to Charleston, West Virginia and was working consistently there. Sydnie testified that she moved to West Virginia because she had family there and because she would be closer to J.F. Sydnie testified that she was willing to do whatever it took to get custody of J.F.

{¶12} Sydnie presented the testimony of several witnesses who had been around her in the past while she was parenting J.F. Sydnie's witnesses described her as a caring, attentive, and doting mother. Sydnie acknowledged that she was wrong for absconding with J.F. Sydnie also testified she was willing to help facilitate visitation for William and his family.

{¶13} William and his wife testified about their difficulties communicating with Sydnie. They also testified that J.F. was thriving in their care over the last 18 months. William testified that his family was bonded to J.F. and that he wished to have legal custody of her.

{¶14} The GAL recommended that J.F. remain with William. However, the GAL testified that he did not believe that Sydnie was an "unfit" parent, which was a requirement that had to be established before awarding custody to a non-parent over a parent. He testified that his focus was on the best interests of the child, and he simply felt J.F. was in a better situation with William.

{¶15} On September 3, 2024, the trial court filed a final judgment entry determining that Zachary's incarceration constituted a change in circumstances that warranted the trial court terminating the parties' shared parenting plan. The trial court subsequently designated Sydnie as J.F.'s residential parent and legal custodian, finding that William failed to satisfy his burden of proof demonstrating that Sydnie was an unfit or unsuitable parent to have custody of J.F.

{¶16} On September 5, 2024, William filed his notice of appeal. He raises two assignments of error for our review, which we will review together.

## First Assignment of Error

**The Trial Court erred in overruling William M. Frankart's Motion for Custody of his grandchild, J.F., and finding Defendant Sydnie A. Phillips was not an unfit and/or unsuitable parent.**

**Second Assignment of Error**

**The Trial Court erred in Designating Defendant Sydnie A. Phillips as the sole residential parent and legal custodian of J.F.**

{¶17} In his assignments of error, William argues that the trial court erred by denying his motion for legal custody of J.F. and by designating Sydnie as J.F.'s residential parent and legal custodian. In particular, William argues that the trial court's fitness and suitability determination improperly focused solely on Sydnie's interests, neglecting J.F.'s welfare in the custody placement decision.

*Standard of Review*

{¶18} We review the grant or denial of a motion for legal custody under an abuse-of-discretion standard. *In re I.T.*, 2023-Ohio-3010, ¶ 17 (3d Dist.). An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). The same standard of review applies to the trial court's determination designating Sydnie as residential parent and legal custodian of J.F. *See Sayre v. Furgeson*, 2016-Ohio-3500, ¶ 49 (3d Dist.).

*Analysis*

{¶19} "Jurisdiction in child custody disputes arises under one of two separate statutes, R.C. 3109.04 and R.C. 2151.23." *Scavio v. Ordway, et al.*, 2010-Ohio-984, ¶ 18 (3d Dist.). "Child custody dispute jurisdiction is conferred on the domestic relations court pursuant to R.C. 3109.04(A) when the custody proceedings arise out

of 'any divorce, legal separation, or annulment proceeding and in any proceeding pertaining to the allocation of parental rights and responsibilities for the care of a child . . . .'" *Id.*, quoting R.C. 3109.04(A).

{¶20} "When jurisdiction for the custody proceeding lies with the domestic relations court, R.C. 3109.04 generally requires the trial court to conduct a two-part test in order to modify custody." *Scavio* at ¶ 19. "First, the trial court must determine whether a change in circumstances has occurred for the child, the child's residential parent, or either of the parents in a shared parenting decree." *Id.* "Second, if the court finds a change in circumstances, it must then determine whether such a modification would be necessary to serve the best interest of the child, and it must find one of three circumstances listed in the statute to be present." *Id.*

{¶21} "Underlying both R.C. 3109.04 and R.C. 2151.23 is the principle that parents are imbued with the fundamental right to care for and retain custody of their children." *Scavio* at ¶ 20; *see also In re Perales*, 52 Ohio St.2d 89, 96 (1977) ("custody proceedings between a parent and a nonparent . . . bring into play the right of the parent to rear his own child." ). Within this fundamental right is the idea that the custody and care of the child should reside first with the parents. *Id.* A parent's right to custody of his or her child has been deemed "paramount" when the parent is a "suitable person." *Id.*; *In re Hayes*, 79 Ohio St.3d 46, 48 (1997).

{¶22} To safeguard the fundamental parental right to custody, Ohio law mandates that in a child custody case between a parent and a nonparent, the trial

court must make an explicit finding of parental unsuitability on the record before awarding legal custody to the nonparent. *Scavio* at ¶ 21; *In re Hockstok*, 2002-Ohio-7208, ¶ 29. "A nonparent may establish unsuitability by demonstrating that '(1) the parent has abandoned the child, (2) the parent contractually relinquished custody of the child, (3) the parent has become incapable of supporting or caring for the child, or (4) an award of custody would be detrimental to the child.'" *In re M.H.*, 2023-Ohio-3776, ¶ 41 (1st Dist.), quoting *In re R.V.*, 2021-Ohio-1830, ¶ 19 (1st Dist.).

**{¶23}** "In assessing the fourth circumstance (i.e., whether there is a preponderance of the evidence showing that an award of custody to the parent would be detrimental to the child), the focus is on the potential harmful effect on the child." *Heberling v. Deckard*, 2024-Ohio-1535, ¶ 36 (3d Dist.). "When making this assessment, 'the trial court must avoid making a determination based purely on the best interest of the child.'" *Id.* at ¶ 37, quoting *In re M.N.*, 2016-Ohio-7808, ¶ 13 (6th Dist.); *see also In re Holycross*, 1999 WL 152853, *2 (3d Dist. Feb. 24, 1999) (noting that "parental custody is presumed to be in the best interests of the child unless it can be shown that placement with a parent will be detrimental to the child."). "Instead, the court should consider the extent and magnitude of harm the child is likely to experience if placed with his or her natural parent." *Heberling* at ¶ 37. Although not exclusive,

> [p]otentially relevant to this consideration is evidence regarding, for example: the parent's history of abuse of the child or of his or her other children, history of failing to meet his or her children's needs,

or lack of involvement with the child or with his or her other children; the child experiencing fear in the parent's home; and whether the child had been living with individuals with whom he or she has established long and significant relationships.

*Id.*

**{¶24}** "If a court concludes that any one of these circumstances describes the conduct of a parent, the parent may be adjudged unsuitable, and the state may infringe upon the fundamental parental liberty interest of child custody." *In re Hockstok*, 2002-Ohio-7208, ¶ 17. "The nonparent seeking custody bears the burden of demonstrating that the parent is unsuitable." *Depinet v. Norville*, 2020-Ohio-3843, ¶ 14 (3d Dist.).

**{¶25}** In this case, the trial court (after making the appropriate change-of-circumstances determination) terminated Zachary and Sydnie's shared parenting plan and designated Sydnie as the sole residential parent and legal custodian of J.F. The trial court concluded that William did not meet his burden of proving that Sydnie is an unsuitable or unfit parent. Reaching this determination, the trial court reasoned that, even though the GAL assessed that it was in J.F.'s best interest to remain in the custody of William, the GAL did not believe that Sydnie would be unfit or unsuitable to raise J.F.

**{¶26}** On appeal, William argues that the trial court abused its discretion by denying his motion for legal custody of J.F., arguing that the trial court prioritized parental rights over the child's well-being. He contends that the trial court failed to

adequately consider evidence demonstrating that awarding custody of J.F. to Sydnie would be detrimental to J.F. This detriment, William argues, stems directly from Sydnie's documented history of instability, blatant disregard for judicial authority, and repeated interference with established parental rights.

{¶27} Specifically, William points to Sydnie's willful and continuous denial of Zachary's court-ordered parenting time, her defiant refusal to return J.F. to Zachary or William's custody despite a direct court order, and her criminal conviction for interference with custody in Sandusky County, Ohio, arising from her absconding with J.F. William contends that Sydnie admitted her intent to disobey a court order regarding J.F.'s return to Zachary, and she admitted that her relocation of J.F. to multiple states in the summer of 2022, without proper notice, was for the purpose of obstructing the efforts of the Frankarts to locate them.

{¶28} Sydnie disputes William's characterization of the evidence presented, though she acknowledged she had made mistakes that led to the current situation. She refutes the claim of instability, asserting that her recent interstate moves were dictated by the demands of her employment "chasing the shutdowns." Sydnie further argues that any past concerns regarding her suitability as a parent are no longer relevant. She emphasizes she has voluntarily completed parenting classes. She emphasizes that although she was never diagnosed with alcohol dependency, she regularly attends AA meetings and she was maintaining her sobriety. She had also secured a stable home in West Virginia, purchased on a land contract.

{¶29} Crucially, Sydnie highlights the testimony of the GAL, who testified that she is neither an unsuitable nor an unfit parent. This independent assessment, she contends, directly contradicts William's accusations and underscores her ability to provide a safe and nurturing environment for J.F. Thus, while William paints a picture of deliberate defiance and instability, Sydnie presents herself as a responsible parent who made poor decisions and has since achieved stability.

{¶30} It is important to emphasize that the law establishes that "parental custody is presumed to be in the best interests of the child" and that it is William's burden to establish that Sydnie is an unfit mother. *In re Holycross*, 1999 WL 152853, *2 (3d Dist. Feb. 24, 1999); *Depinet v. Norville*, 2020-Ohio-3843, ¶ 14 (3d Dist.). When considering the four avenues William could establish that Sydnie was an unfit mother, there was no evidence that Sydnie had abandoned J.F. (1); there was no evidence that Sydnie contractually relinquished custody of J.F. (2); and there was no evidence that Sydnie was incapable of supporting or caring for J.F. (3). Thus, the only remaining avenue available for William to establish that Sydnie was an unfit mother was to establish that "an award of custody [to Sydnie] would be detrimental to [J.F.]."

{¶31} William did present testimony that J.F. was flourishing in his care, and there is really no dispute on that issue. However, there was competing testimony from Sydnie's witnesses that J.F. had been well-cared for when she was in Sydnie's

custody. There was no compelling evidence presented that J.F. was inadequately cared for when with Sydnie.

**{¶32}** It is true that Sydnie's chosen profession could result in J.F. having to move more often than a typical child, but this does not directly equate to the lifestyle being "detrimental" to J.F. Such a holding would put in jeopardy the custody of children everywhere who have parents with mobile careers. It is also true that Sydnie improperly absconded with J.F., albeit after she learned Zachary had been charged with numerous sexual assault crimes. Zachary's actions do not, in any way, excuse Sydnie's actions, but they do provide some context.

**{¶33}** After reviewing all the evidence presented, and in particular the GAL's testimony that Sydnie was not "unfit," we do not find that the trial court abused its discretion by finding that William failed to meet his burden of proof establishing that Sydnie was an "unfit" parent. While William, and the dissenting judge, argue for a stronger emphasis to be placed on the child's best interests, the law indicates that to award custody of a child to a non-parent over a parent, the non-parent must demonstrate that the parent is unfit. On the evidence presented, we do not find that the trial court abused its discretion by determining William failed to meet that burden. Therefore, William's first and second assignments of error are overruled.

*Conclusion*

**{¶34}** Having found no error prejudicial to William in the particulars assigned and argued, his assignments of error are overruled and the judgment of the Seneca County Common Pleas Court, Domestic Relations Division, is affirmed.

***Judgment Affirmed***

**WILLAMOWSKI, J., concurs.**

**ZIMMERMAN, J., dissents.**

**{¶35}** While I respect the majority opinion's diligent efforts in reaching its conclusion, I must respectfully dissent from its decision to affirm the judgment of the trial court denying William's motion for legal custody of J.F. and designating Sydnie as the residential parent and legal custodian of J.F. In my opinion, the majority opinion's determination that William failed to meet his burden of proving Sydnie unfit or unsuitable, and its subsequent affirmation of Sydnie as J.F.'s residential parent and legal custodian, rests upon a narrow interpretation of Ohio law that, in my view, fails to adequately safeguard the paramount interest of the child's welfare.

**{¶36}** The majority opinion correctly outlines that jurisdiction in child custody disputes typically arises under either R.C. 3109.04 or R.C. 2151.23. *Scavio v. Ordway*, 2010-Ohio-984, ¶ 18. Specifically, R.C. 3109.04(A) governs proceedings related to divorce, legal separation, or annulment, and other matters pertaining to the allocation of parental rights. *Id.* When domestic relations courts

exercise jurisdiction under R.C. 3109.04, custody modification generally involves a two-part test: first, determining if a change in circumstances has occurred; and second, if so, assessing whether modification serves the child's best interest and satisfies one of three statutory conditions. *Id.* at ¶ 19. While I agree with the majority that Zachary's incarceration constitutes a change in circumstances, my divergence with the majority opinion arises in the application of the second part of this test, particularly as it pertains to custody awards involving non-parents.

**{¶37}** A foundational principle underlying both R.C. 3109.04 and R.C. 2151.23 is the fundamental right of parents to care for and retain custody of their children. *Id.* at ¶ 20. This right is "paramount" when the parent is "suitable." *Id.* However, it is crucial to recognize that this parental right is not absolute. *See Heberling v. Deckard*, 2024-Ohio-1535, ¶ 34 (3d Dist.). Rather, the first interest in all custody matters is the *welfare of the child. See In re Perales*, 52 Ohio St.2d 89, 97-98 (1977) (noting that in cases concerning the controverted right to custody, "[t]he welfare of the child is the interest given priority the 'first' interest"). Indeed, "[t]he parent's interest is recognized 'by limiting the reasons for which parents may be denied the custody of their children.'" *Heberling* at ¶ 34, quoting *In re Perales* at 98.

**{¶38}** As the majority opinion correctly points out, Ohio law requires an explicit finding of parental unsuitability on the record before awarding legal custody to a nonparent. *Scavio* at ¶ 21; *In re Hockstok*, 2002-Ohio-7208, ¶ 29. To reiterate,

this unsuitability can be demonstrated by showing that: (1) the parent has abandoned the child, (2) the parent contractually relinquished custody, (3) the parent has become incapable of supporting or caring for the child, or (4) an award of custody would be detrimental to the child. *In re M.H.*, 2023-Ohio-3776, ¶ 41 (1st Dist.).

{¶39} The majority's opinion, in my view, understates the significance of the fourth circumstance: whether an award of custody to the parent would be detrimental to the child. Importantly, when assessing this factor, the focus must be on the potential harmful effect on the child. *Heberling* at ¶ 36. That is, while the trial court must avoid a determination based purely on the best interest of the child, it must consider the extent and magnitude of harm the child is likely to experience if placed with his or her natural parent. *Id.* at ¶ 37. This consideration is critical, and it can include evidence regarding, for example: a parent's history of abuse or neglect, lack of involvement, the child experiencing fear, or whether the child had been living with individuals with whom he or she has established long and significant relationships. *Id.* The majority opinion acknowledges this framework but, crucially, fails to apply it with the necessary rigor to the facts of this case.

{¶40} Thus, based on my review of the specific facts and circumstances presented by this case, I would find merit with William's contention that the trial court abused its discretion by denying his motion for legal custody of J.F. Specifically, my examination of the record before this court demonstrates that the trial court's fitness and suitability determination focused solely on Sydnie's

interests, neglecting to consider J.F.'s welfare in its custody placement decision. This oversight, in my opinion, stems from a fundamental deficiency in Ohio jurisprudence: the lack of a clear framework for applying the paramount consideration of the "welfare of the child" in unique parent-non-parent custody disputes. Given this fundamental deficiency in Ohio jurisprudence, I find it necessary to address the proper scope of that consideration in this unique case.

{¶41} This case therefore highlights a crucial aspect of Ohio law concerning the precise parameters of the "welfare of the child" within parental fitness and suitability analysis. While Ohio courts require a determination of parental unsuitability—which may include assessing detriment to the child—Ohio courts have not explicitly defined what constitutes the child's "welfare" in this context. This lack of clear definition makes the standard susceptible to misinterpretation or complete oversight during suitability determinations, particularly in complex cases like this one.

{¶42} Importantly, Ohio law correctly acknowledges the paramount importance of the child's welfare, balanced against the strong parental right to raise their children. However, unlike courts in other jurisdictions, Ohio has not expressly articulated the specific factors that may constitute the child's welfare beyond the general concept of detriment. Courts in other states have recognized that the "welfare of the child" analysis can encompass "'a special or extraordinary reason or circumstance'" that will justify third-party custody, including significant bonding

in a familial-custody relationship. *Bowers v. Bowers*, 543 S.W.3d 608, 617 (Mo. 2018), quoting *C.L. v. M.T.*, 335 S.W.3d 19, 30 (Mo.App. 2011). *See also Young v. Young*, 14 S.W.3d 261, 264 (Mo.App. 2000) (noting that "[s]ignificant bonding in a familial-custody relationship with a third party . . . can constitute a special circumstance"); *In re Sofia S.S.*, 145 A.D.3d 787, 789 (N.Y. App. Div. 2016) (considering the extraordinary circumstances when assessing the welfare of a child in a custody dispute between a parent and a non-parent); *B. O. v. S. O.*, 252 Md.App. 486, 514 (Md.App. 2021) (clarifying that "the 'best interest of the child' test is only to be considered where the parents are unfit or exceptional circumstances exist.").

{¶43} Notwithstanding the consideration of such exceptional circumstances, it is imperative to distinguish this "welfare of the child" analysis, which focuses on parental fitness, from the separate and distinct "best interest" analysis conducted under R.C. 3109.04(F). Critically, these are *distinct* considerations. The "welfare of the child" analysis, as it pertains to parental fitness, is a threshold determination that must precede the application of R.C. 3109.04(F).

{¶44} Having established the distinct nature of the "welfare of the child" analysis and its paramount importance in determining parental fitness, I now turn to the specific facts and circumstances of this case to assess whether the trial court properly applied this standard. For illustration of the trial court's application of this standard, the entirety of the trial court's analysis concerning whether Sydnie is an

unfit or unsuitable parent, specifically from the standpoint of whether a custody award would be detrimental to J.F., is reproduced below:

> The [GAL] has been involved in this case for over the past eighteen (18) months. He made as thorough of an investigation as he was able, under the circumstances of the case. He opined it would be in the child's best interest to stay where she has been since September 12, 2022, which is in the temporary custody of the child's grandfather continuing to live with he, grandmother, and her aunt on the farm.
>
> It is noteworthy, the [GAL] candidly admitted that despite his recommendations that it would be in the child's best interest to remain in her present placement, that nevertheless he clearly and unequivocally felt [Phillips] did not abandon her child nor did she contractually release custody. He went on to represent mother was, and is, capable of caring and supporting her daughter, and although there may be some initial transition involving different people, that in the big picture, custody to mother would not be detrimental to her daughter. He lastly summed up his testimony that he saw nothing that would point to [Phillips] being unfit or unsuitable to raise her daughter.

(Doc. No. 206-207).

**{¶45}** After assessing the *parameters* of what constitutes detriment to the child while considering the child's welfare, alongside the strong parental preference, I would conclude that the trial court's analysis fails to adequately consider J.F.'s welfare. Indeed, in my view, the trial court's entry focuses exclusively on Sydnie's interests, relying heavily on the GAL's assessment, which itself reveals a critical deficiency. Specifically, this deficiency stems from the GAL's misapplication of the relevant standard.

{¶46} Importantly, my review of the record reflects that the GAL's assessment, presented as an "on the spot" evaluation of parental suitability, highlights this shortcoming. Contrary to the required analysis of parental fitness and the child's welfare, the GAL testified that he did not consider parental suitability; he considered only J.F.'s best interest when rendering his report and recommendation. In other words, while the GAL's testimony references J.F.'s "best interest" in remaining in her current placement, his testimony failed to delve into the specific aspects of her welfare that should have been considered. However, even with this flawed approach, the GAL's testimony still provides competent, credible evidence that the trial court could have, and should have, considered in assessing J.F.'s welfare.

{¶47} In particular, the record contains evidence of J.F.'s strong bond with William and her extended family, as well as the stability she enjoys living on William's farm. These factors, as previously discussed, can constitute evidence of those exceptional circumstances to be considered within the child's welfare analysis. Moreover, the GAL's testimony regarding J.F.'s "underdeveloped" academic status, contrasted with her social comfort around strangers—a direct result of Sydnie's transient lifestyle—provides further compelling evidence of the impact of Sydnie's actions on J.F.'s well-being. (May 23, 2024 Tr. at 818).

{¶48} Furthermore, the foregoing evidence, solely focused on J.F.'s welfare, does not consider the evidence of Sydnie's conduct that was presented at trial, such

as fleeing the jurisdiction and violating court orders, which provides even more evidence related to J.F.'s welfare, and should have been considered and weighed by the trial court (as exceptional circumstances) when assessing parental suitability. *Compare Ruiz v. Spinnelli*, 162 A.D.3d 673, 673-674 (N.Y. App. Div. 2018) (assessing that "[t]he mother's conduct in relocating with the children to Florida without seeking the permission of the father or of the Family Court, and concealing the location of the children, raises a strong probability that she is unfit to continue to act as the custodial parent, and constituted a change in circumstances sufficient to warrant a change in custody"); *Tori v. Tori*, 103 A.D.3d 654, 655 (N.Y. 2013) ("Interference with the relationship between a child and the noncustodial parent is an act so inconsistent with the best interests of the child as to per se raise a strong probability that the offending party is unfit to act as custodial parent.").

{¶49} In sum, this evidence, readily available in the record, demonstrates, in my opinion, that the trial court had ample information to conduct a thorough analysis of J.F.'s welfare. The trial court's failure to do so, instead relying solely on the GAL's cursory assessment of Sydnie's suitability, constitutes an abuse of discretion. Therefore, it is my opinion that the trial court abused its discretion by denying William's motion for legal custody of J.F. and by designating Sydnie as J.F.'s residential parent and legal custodian. Accordingly, I would reverse the trial court's designation of Sydnie as J.F.'s residential parent and legal custodian, as well as the trial court's suitability determination, and remand the matter to the trial court

for a new trial consistent with my opinion. Importantly, my proposed resolution would not render any decision on the ultimate outcome of Sydnie's motion requesting that the trial court designate her as J.F.'s residential parent and legal custodian or as to William's motion for legal custody. Instead, I would propose that the trial court conduct a new hearing and analysis consistent with the law as outlined in my opinion.

Case No. 13-24-36

# JUDGMENT ENTRY

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgments of the trial court are affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

_____
Juergen A. Waldick, Judge


_____
John R. Willamowski, Judge


DISSENTS_____
William R. Zimmerman, Judge


DATED:
/jlm